HORSESHOE HAMMOND, LLC,
f/k/a Horseshoe Hammond,
Inc., Petitioner,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.

No. 49T10–0411–TA–53.

Tax Court of Indiana.

May 1, 2007.

Barton T. Sprunger, Mark J. Richards, Ice Miller, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Andrew W. Swain, Special Coun-

sel, Tax Section, Jennifer E. Gauger, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

FISHER, J.

Horseshoe Hammond, LLC (Horseshoe) challenges the final determination of the Indiana Department of State Revenue (Department) denying its claim for refund of use taxes paid during the year ending December 31, 2001 (the year at issue). The matter is currently before the Court on the parties' cross-motions for summary judgment. The sole issue for the Court to decide is whether Horseshoe's provision of complimentary merchandise and meals to some of its casino patrons during the year at issue was subject to Indiana's sales or use tax.

### FACTS AND PROCEDURAL HISTORY

Horseshoe is an Indiana corporation with its principal place of business in Hammond, Indiana. During the year at issue, Horseshoe, a licensed riverboat operator, operated an excursion gaming boat from its dock on Lake Michigan. In conjunction with its gaming operations, Horseshoe also operated a gift shop, as well as several restaurants and bars, from its dock.

During the year at issue, Horseshoe periodically provided complimentary merchandise and/or meals to certain casino patrons who were members of its "Player's Club."[1] Horseshoe's reason for offering the complimentary merchandise and meals was "to cultivate customer relations so that customers w[ould] stay on the property, come to the property, or return to the property."[2] (Pet'r Post Hr'g Br. at 3 (footnote added).) Horseshoe remitted Indiana use tax to the Department on these complimentary offerings (based on their advertised retail prices).

On March 13, 2003, Horseshoe filed a claim with the Department requesting a refund of, among other things, the $87,635.17 in use tax it remitted on the complimentary merchandise and meals. When Horseshoe had not received a final

---

1. Any casino patron who was at least 21 years of age and who presented valid identification was eligible to join Horseshoe's Player's Club. Membership in the Club was free. Upon joining the Club, patrons were issued a Player's Club card that, when gambling, the member could either insert into a slot machine or present to a gaming table attendant.

A Player's Club card essentially served two main functions. First, it allowed a member to accumulate and track points earned as a result of the amount of "coin-in" a slot machine. Members could eventually exchange these points for cash, meals or merchandise. Second, it allowed Horseshoe to "monitor" a patron's *overall* gambling activity, (*i.e.*, how much did the patron spend at slot machines, how much did the patron spend on table gaming, what was the patron's average wager, how long did the patron play, how much did the patron win or lose). Through the application of a formula which utilized some of this information, Horseshoe determined to whom it would offer complimentary merchandise and meals (i.e., its "good" customers). (*See* Oral Argument Tr. at 39–40.) (*See also* Pet'r Second Aff. of Joseph Branchik, ¶ 4(a), (b); Third Aff. of Joseph Branchik, ¶ 2(a)-(f).)

2. Typically, Horseshoe would issue its complimentary offer via a paper voucher: the voucher would indicate to whom the offer was made, where it was redeemable, and the value of the offer. (*See* Resp't Br. In Reply to Pet'r Reply Br. (hereinafter, Resp't Br.) at Ex. A.) All complimentary offers were made at the discretion of Horseshoe. Horseshoe's complimentary offers were issued for a specific outlet on the property and typically expired if not used within 24 hours. The complimentary offers were nontransferable, carried no cash redemption value, and were revocable by Horseshoe at any time.

determination from the Department on its refund claim by November 30, 2004, it initiated this original tax appeal. Horseshoe filed a motion for summary judgment on September 12, 2005, and the Department filed its response brief on January 19, 2006.[3] The Court conducted a hearing on the matter on July 21, 2006. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

■ This Court reviews the Department's denial of claims for refund *de novo.* IND.CODE ANN. § 6-8.1-9-1(d) (West 2007). Accordingly, the Court is bound by neither the evidence nor the issues presented at the administrative level. *Snyder v. Indiana Dep't of State Revenue,* 723 N.E.2d 487, 488 (Ind. Tax Ct.2000), *review denied.*

Summary judgment is only appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Snyder,* 723 N.E.2d at 488. Cross-motions for summary judgment do not alter this standard. *Williams v. Indiana Dep't of State Revenue,* 742 N.E.2d 562, 563 (Ind. Tax Ct.2001).

## DISCUSSION AND ANALYSIS

Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND.CODE ANN. § 6-2.5-2-1(a) (West 2001). A retail transaction occurs when, *inter alia,* a re-

tail merchant in the ordinary course of his regularly conducted trade or business acquires tangible personal property for the purpose of resale and transfers that property to another person for consideration. *See* IND.CODE ANN. § 6-2.5-4-1(a), (b) (West 2001).

Indiana also imposes a complementary tax, known as the use tax, on the use, storage, or consumption of tangible personal property in Indiana. *See* IND.CODE ANN. § 6-2.5-3-2 (West 2001). The use tax is complementary to the sales tax because it ensures that non-exempt retail transactions that have escaped sales tax liability are nonetheless taxed.[4] *See USAir, Inc. v. Indiana Dep't of State Revenue,* 623 N.E.2d 466, 468-69 (Ind. Tax Ct.1993) (footnote added).

Indiana's legislature has also provided a variety of exemptions from these complementary taxes. *See* IND.CODE ANN. §§ 6-2.5-5-1 to -38.2 (West 2001). While these exemptions are specifically delineated as exemptions from sales tax, they are also applicable to the use tax.[5] *See* IND.CODE ANN. § 6-2.5-3-4(a)(2) (West 2001) (footnote added). *See also Rotation Prods. Corp. v. Dep't of State Revenue,* 690 N.E.2d 795, 798 n. 5 (Ind. Tax Ct.1998).

### I. Complimentary Merchandise

When Horseshoe purchased merchandise for resale in its gift shop, it was not required to pay Indiana sales tax on those

---

**3.** Although not captioned as a motion for summary judgment, the Department's response brief requests that summary judgment be entered in its favor. Therefore, the Court will treat the Department's request as a cross-motion for summary judgment. *See Hunt Corp. v. Dep't of State Revenue,* 709 N.E.2d 766, 767 n. 5 (Ind. Tax Ct.1999).

**4.** Indiana's use tax is primarily designed to reach out-of-state sales of tangible personal property that is subsequently used in Indiana.

*See Rhoade v. Indiana Dep't of State Revenue,* 774 N.E.2d 1044, 1047 (Ind. Tax Ct.2002).

**5.** Indeed, the "storage, use, and consumption of tangible personal property in Indiana is exempt from the use tax if ... the property was acquired in a transaction that is ... exempt from the [sales] tax ... and the property is being used, stored, or consumed for the purpose for which it was exempted." IND. CODE ANN. § 6-2.5-3-4(a)(2) (West 2001).

retail transactions. *See* IND.CODE ANN. § 6–2.5–8–8 (West 2001) (stating generally that purchases of tangible personal property were exempt from sales tax if the person who acquired the property acquired it for the purpose of resale). (*See also* Pet'r Br. in Supp. of [Its] Mot. for Summ. J. (hereinafter, Pet'r SJ Br.) at 5 (citation omitted); Resp't Restatement of Facts at 3 (footnote omitted).) When Horseshoe subsequently resold that merchandise to its casino patrons, those transactions were subject to sales tax. *See* A.I.C. § 6–2.5–4–1(a), (b).

With respect to the merchandise that Horseshoe offered to Player's Club members on a complimentary basis during the year at issue, Horseshoe concedes that it owes use tax thereon. (*See* Pet'r SJ Br. at 8.) Horseshoe asserts, however, that it miscalculated the amount of use tax it owed and is therefore entitled to a refund of its overpayment. The Department, on the other hand, advances two alternative arguments as to why it believes Horseshoe is not entitled to the refund. First, it claims that in providing the complimentary merchandise to casino patrons, Horseshoe was, in fact, making retail transactions that were subject to sales tax. In the alternative, the Department argues that Horseshoe properly calculated and remitted use tax on the complimentary merchandise.

### A. Sales Tax

■ The Department first claims that in providing complimentary merchandise to casino patrons, Horseshoe was making a retail transaction "in disguise." (*See*

Resp't Br. in Reply to Pet'r Reply Br. (hereinafter, Resp't Br.) at 9–10.) More specifically, the Department argues that pursuant to Indiana Code § 6–2.5–4–1, Horseshoe: (1) acquired merchandise for the purpose of reselling it to its customers; and (2) while it did not transfer the complimentary merchandise for money, it nonetheless transferred it for consideration, that consideration being the patrons' continued "gaming activity and customer loyalty." (*See* Resp't Br. at 7, 9.) As a result, the Department asserts that Horseshoe is not entitled to the refund of use tax it remitted.[6]

To support its argument that Horseshoe received consideration for the complimentary merchandise, the Department relies on an excerpt from this Court's opinion in *Monarch Beverage Company v. Indiana Department of State Revenue*, 589 N.E.2d 1209 (Ind. Tax Ct.1992). (*See* Resp't Br. at 7–8.) That excerpt states:

[t]he concept of consideration evolved from the law of contracts. In order to have a legally binding contract there must generally be an offer, acceptance, and consideration. Consideration is essential to every contract. Indiana has long held that consideration in the form of money is not essential to a binding contract. A mere promise is sufficient as consideration if it is the result of a bargained for exchange. Moreover, a benefit to the promisor or a detriment to the promisee is sufficient as consideration. The doing of an act by one at the request of another which may [be] a detrimental inconvenience, however

---

**6.** In other words, Horseshoe, as an agent for the Department, was charged with collecting sales tax on each of the alleged retail transactions. *See* IND.CODE ANN. § 6–2.5–2–1(b) (West 2001). *See also* IND.CODE ANN. § 6–2.5–6–1, –2, –7 (West 2001) (all describing how a retail merchant is to file sales tax returns with the Department in which it reports taxable trans-

actions and the tax collected thereon). Because Horseshoe did not collect sales tax from the casino patrons on the complimentary merchandise, it is now liable for the tax. *See* A.I.C. § 6–2.5–6–7 (stating generally that retail merchants are liable for the difference between what they were supposed to collect in sales tax and what they actually collected).

slight, to the party doing it or [ ] a benefit, however slight, to the party at whose request it is performed, is legal consideration for a promise by such requesting party.

(Resp't Br. at 8 (quoting *Monarch Beverage Co. v. Indiana Dep't of State Revenue,* 589 N.E.2d 1209, 1212 (Ind. Tax Ct.1992) (internal citations and quotation omitted)).) Accordingly, the Department is convinced that "[i]n this matter, there was consideration [because t]here was a benefit to the Players Club members—free ... merchandise [and t]here was a detriment to Horseshoe—the cost of providing the free ... merchandise." (Resp't Br. at 8.) The Court, however, does not find the Department's argument convincing.

As this Court explained in *Monarch Beverage,* consideration—no matter what its form—consists of a bargained-for exchange. *See Monarch Beverage Co.,* 589 N.E.2d at 1212. *See also Tolliver v. Mathas,* 538 N.E.2d 971, 974 (Ind.Ct.App. 1989). This means that the essence of the transaction must involve an exchange *that has been agreed to. See Monarch Beverage Co.,* 589 N.E.2d at 1212 (discussing an exchange of promises). *See also Bogigian v. Bogigian,* 551 N.E.2d 1149, 1151 (Ind. Ct.App.1990) (stating that any benefit received by a party, or any detriment suffered by the other party, will not be deemed to be consideration if the parties did not so agree). Here, there is no evidence demonstrating that Horseshoe and its Player's Club members *bargained* for "continued gaming activity and customer loyalty" in exchange for the benefit of complimentary merchandise flowing to the casino patrons to the detriment of Horseshoe. In other words, the casino patrons never agreed or promised Horseshoe that they would continue their gaming activity

in exchange for free merchandise.[7] Likewise, while Horseshoe *hoped* its provision of complimentary merchandise would assist in cultivating customer relationships, it never promised complimentary merchandise to anyone: the provision of complimentary merchandise was a purely discretionary act.

Because Horseshoe and the recipients of the complimentary merchandise did not bargain for "continued gaming activity and customer loyalty," Horseshoe did not receive consideration for the complimentary merchandise. Accordingly, Horseshoe's provision of complimentary merchandise was not a retail transaction subject to sales tax.

### B.  Use Tax

■ Pursuant to the Department's second argument, Horseshoe owed use tax on the complimentary merchandise it gave away. Horseshoe has conceded this point. (*See* Pet'r SJ Br. at 8.) Nevertheless, the parties dispute how the tax is to be calculated. While Horseshoe asserts that its use tax liability should be calculated based on the price it paid to acquire the merchandise from its suppliers, the Department asserts that the liability should be calculated based on the price Horseshoe would have sold the merchandise for in its gift shop had it not given it away. Horseshoe is correct.

Indiana's use tax "is imposed on the storage, use, or consumption of tangible personal property in Indiana if the property was acquired in a retail transaction, regardless of the location of that transaction or of the retail merchant making that transaction." A.I.C. § 6–2.5–3–2(a). The amount of use tax due "is measured by the gross retail income received in [the] retail [ ] transaction and is imposed at the same

---

**7.** If anything, the casino patrons receiving the complimentary merchandise probably thought they were receiving it as a "thank-you" or reward for *previous* gaming activity.

rates as the [sales] tax[.]"[8] IND.CODE ANN. § 6–2.5–3–3 (West 2001) (footnote added). Thus, while Indiana's use tax is imposed on the act of "storing, using, or consuming" tangible personal property in Indiana, the amount of tax due is determined as a percentage of the price by which the tangible personal property was acquired or purchased.[9] *See* A.I.C. § 6–2.5–3–2(a), –3 (footnote added).

Horseshoe was required to remit use tax on its complimentary merchandise based on the price by which it acquired the merchandise from its suppliers. Because Horseshoe remitted tax based on the price by which it would have otherwise sold the merchandise, Horseshoe is now entitled to a refund of its overpayment.[10]

## II. *Complimentary Meals*

The parties also disagree as to the taxability of Horseshoe's provision of complimentary meals to Player's Club members. While Horseshoe remitted $86,622.13 in use tax on these complimentary meals, it claims that it did so in error and it is therefore entitled to a refund of its erroneous payment. The Department claims, again, that Horseshoe is not entitled to the refund because Horseshoe either owed sales tax on the complimentary meals or, in the alternative, that Horseshoe owed use tax on the "meal components" that were incorporated into those complimentary meals.

8. During the year at issue, Indiana's sales tax was imposed at the rate of 5%. *See* IND.CODE ANN. § 6–2.5–2–2 (West 2001).

9. Essentially, the Department based its argument on the following: 1) the use tax is imposed on the gross retail income received by the retail merchant; and 2) Horseshoe was a retail merchant making a retail transaction when it transferred the complimentary merchandise to the casino patrons. (Resp't Br. at 14–15 (citations omitted).) Thus, the Department concluded, Horseshoe owed use tax on

## A. *Sales Tax*

■ The Department makes the same argument with respect to Horseshoe's provision of complimentary meals as it did with respect to Horseshoe's provision of complimentary merchandise: Horseshoe's provision of complimentary meals is a retail transaction subject to sales tax because Horseshoe acquired food for resale and then transferred it—in the form of prepared meals—for the consideration of continued gaming activity and customer loyalty. (*See* Resp't Br. at 7–10.) Consequently, the Court rejects the argument for the same reasons it rejected the argument with respect to the complimentary merchandise.

## B. *Use Tax*

■ In the alternative, the Department argues that Horseshoe is not entitled to the refund because it owes tax on its storage, use, and consumption of the "meal components" which were incorporated into the complimentary meals provided to the Player's Club members. (*See* Resp't Br. at 11–14.) The Court, however, disagrees.

During the year at issue, Indiana Code § 6–2.5–5–20 provided:

(a) Sales of food for human consumption are exempt from the state gross retail tax.

the merchandise's "marked up, retail price" and not its initial cost of acquisition. (Resp't Br. at 15.) The Department's argument, however, ignores one essential point: there was no retail transaction between Horseshoe and the recipient of the complimentary merchandise. *See discussion, supra.* Instead, the only retail transaction here was between Horseshoe and its suppliers of the merchandise.

10. The amount of the refund, not including interest, is $1,013.04. (*See* Resp't Br. at 6.)

(b) For purposes of this section, the term "food for human consumption" includes

(1) cereals and cereal products;

(2) milk and milk products, including ice cream;

(3) meat and meat products;

(4) fish and fish products;

(5) eggs and egg products;

(6) vegetables and vegetable products;

(7) fruit and fruit products, including fruit juices;

(8) sugar, sugar substitutes, and sugar products;

(9) coffee and coffee substitutes;

(10) tea, cocoa, and cocoa products;

(11) spices, condiments, extracts, and salt;

(12) oleomargarine; and

(13) natural spring water.

(c) [F]or purposes of this section, the term "food for human consumption" does not include:

(1) candy[,] confectionery, and chewing gum;

(2) alcoholic beverages;

(3) cocktail mixes;

(4) soft drinks; sodas, and other similar beverages;

(5) medicines, tonics, vitamins, and other dietary supplements;

(6) water (except natural spring water), mineral water, carbonated water, and ice;

(7) pet food;

(8) food furnished, prepared, or served for consumption at a location, or on equipment, provided by the retail merchant;

(9) meals served by a retail merchant off the merchant's premises;

(10) food sold by a retail merchant who ordinarily bags, wraps, or packages the food for immediate consumption on or near the merchant's premises, including food sold on a "take out" or "to go" basis; and

(11) food sold through a vending machine[ ] or by a street vendor.

IND.CODE ANN. § 6–2.5–5–20 (West 2001) (amended 2003). Thus, as this Court has explained:

Subsection 6–2.5–5–20(a) exempts purchases of "food for human consumption" from Indiana sales and use tax. Section 6–2.5–5–20(b) defines "food for human consumption." Subsection 6–2.5–5–20(c) excludes certain types of foods and transactions from the "food for human consumption" definition. . . . A reading of subsections (c)(8) through (c)(11) reveals that the legislature intended to exclude transactions involving prepared food from the definition of "food for human consumption." Subsection (c)(8) deals with sales of restaurant meals. Subsection (c)(9) deals with sales of catered meals. Subsection (c)(10) deals with sales of food for immediate human consumption, i.e., sales of ready-to-eat food.

*Hyatt Corp. v. Dep't of State Revenue*, 695 N.E.2d 1051, 1054–55 (Ind. Tax Ct.1998), *review denied.*

The Department is correct when it claims that "Horseshoe [a]cquired the [m]eal's [c]omponents . . . in a[r]etail [t]ransaction . . . [and s]tored, [u]sed, or [c]onsumed the[m] . . . in Indiana."[11]

11. The Department explains that Horseshoe "stored, used, or consumed" the meal components because they

were taken out of Horseshoe's inventory and/or prepared for otherwise taxable sales. . . . The food . . . w[as] consumed by Horseshoe for the purpose of encouraging

(Resp't Br. at 12–13 (footnote added).) Pursuant to Indiana Code § 6–2.5–5–20(a), however, Horseshoe's purchases of the meal components, *and subsequent use thereof,* are exempt from tax. A.I.C. § 6–2.5–5–20(a). *See also Hyatt Corp.,* 695 N.E.2d at 1052, 1055–56. Thus, Horseshoe does not owe use tax on the meal components.[12]

## CONCLUSION

For the above stated reasons, the Court GRANTS summary judgment in favor of Horseshoe and AGAINST the Department. The parties shall bear their own costs.

gaming activities.... Horseshoe accepted delivery of the food and ... [i]t can be reasonably inferred that Horseshoe store[d] the food ... until it [wa]s prepared and then sold or given away[.]
(Resp't Br. at 14.)

12. The Court notes that the Department's written brief seems to jump from its discussion as to why Horseshoe's use of the "meal components" is subject to tax to the conclusion that Horseshoe's provision of the complimentary meals is subject to tax. (*See* Resp't Br. at 12 (stating that Horseshoe's acquisition of meal components in a retail transaction and subsequent use of those components in Indiana "mak[e] Horseshoe's complimentary meals ... subject to Indiana's use tax")) 18 (stating that the complimentary meals are subject to Indiana's use tax because the meal components were acquired in a retail transaction and the meals were used or consumed in Indiana). This leap in reasoning fails to account for the statutory distinction between the purchase/use of unprepared food items and the purchase/use of prepared meals sold in a restaurant. *Cf.* A.I.C. § 6–2.5–5–20(a) *with* (c)(8).

Pursuant to Indiana Code § 6–2.5–5–20(a), Horseshoe's purchase of unprepared food items, and its subsequent use thereof, is exempt from tax. Consequently, how Horseshoe uses the items is irrelevant (i.e., whether Horseshoe uses the food to prepare meals that are to be sold, uses them to prepare meals that are to be given away, or it simply throws the food away), as its *use of those items* is not taxable. *See Hyatt Corp. v. Dep't of State Revenue,* 695 N.E.2d 1051, 1056–57 (Ind. Tax Ct.1998), *review denied.*

Pursuant to Indiana Code § 6–2.5–5–20(c)(8), the sale of restaurant meals is a taxable event. Thus, as Horseshoe admits, when it sells a prepared meal in one of its restaurants, it is making a retail transaction and is therefore required to collect sales tax from the consumer on the transaction. If, however, Horseshoe failed to collect sales tax from the consumer, it would owe the use tax thereon. Here, however, because Horseshoe never "sold" its complimentary meals (i.e., it never transferred the complimentary meals for consideration), it was not required to remit tax thereon.